## WOODWARD IRON CO. v. WHEELER.

(Circuit Court of Appeals, Fifth Circuit. December 15, 1922. Rehearing Denied February 3, 1923.)

No. 3960.

Master and servant ⊕⇒234(3)—Workman crossing molder's pit held negligent.

A hot pot engine fireman, who crossed over a molder's pit to get a drink while a casting was being made, and in recrossing jumped into the pit and stepped into molten iron in a mold, which he was unable to see because enveloped in steam from mud shot into the opening of the furnace, *held* guilty of contributory negligence in adopting a forbidden route under circumstances giving warning of danger.

In Error to the District Court of the United States for the Northern District of Alabama; William I. Grubb, Judge.

Action by E. L. Wheeler against the Woodward Iron Company. Judgment for plaintiff, and defendant brings error. Reversed.

W. H. Sadler, Jr., of Birmingham, Ala., for plaintiff in error.

Erle Pettus, of Birmingham, Ala. (Erle Pettus and W. H. Murphy, both of Birmingham, Ala., on the brief), for defendant in error.

Before WALKER, BRYAN, and KING, Circuit Judges.

WALKER, Circuit Judge. This was an action by the defendant in error (herein called the plaintiff) to recover damages for personal injuries resulting from his stepping in molten iron. The case went to the jury on two counts of the complaint—one attributing the injury to negligence chargeable against the defendant with reference to a defective condition of the ways, works, machinery, or plant connected with or used in defendant's business, and the other to the negligence of J. A. Gates, who was in the service or employment of the defendant, and had superintendence intrusted to him, whilst in the exercise of such superintendence, in that he negligently caused or permitted a jet of steam to be turned on the plaintiff while plaintiff was in a place of danger in the act of crossing over molds containing molten iron. Evidence adduced tended to prove the following state of facts:

Plaintiff was the fireman of a locomotive called the hot pot engine, which moved a slag receptacle called a hot pot to and from a place near a blast furnace operated by the plaintiff in error, the defendant below. Plaintiff had been so working there for several months. Shortly prior to the time of the injury plaintiff left the engine after it placed a hot pot where it was to receive its load, and went to a place nearer the furnace for a drink of water. Between the place where the engine was and the water cooler to which plaintiff went, there was a space called the molder's pit, which was about 24 feet wide and about 30 feet long, and was covered with sand. In the upper part of that pit, next to the furnace, was a space used in making molds for casting iron, such molds being depressions several inches deep in moist sand. In the lower part of it, farther from the furnace, was another space used for the same purpose. Between the lower and upper molding spaces there was a space several feet wide, above the level of the

molding spaces, extending from the side where the engine stopped to the opposite side, and next to the lower side of the pit was another elevated space, which could be used as a walkway by one going to or from the engine. By using either of those elevated spaces one going from one side of the pit to the other would avoid a mold, if there was one or more in a molding space. Along the side of the molder's pit opposite the side near the engine was an embankment of sand about 6 feet wide, called the runway, near the center of which were two troughs through which iron flows from the furnace. Iron to be cast in the molder's pit came from the trough next to it; that trough being tapped to let iron into the mold.

It was customary for employees wanting drinking water to go across the molder's pit, and over or along the runway. The evidence was conflicting as to the route taken by the plaintiff in going to the water cooler—some of it being to the effect that he used the elevated strip along the lower side of the pit, some to the effect that he used the elevated strip between the molding spaces, and the plaintiff's testimony being to the effect that when he went to the water cooler he went through the molder's pit and went back practically the same way. There was evidence tending to prove that it was customary for employees to go the shortest way across the molder's pit, but that it was customary not to step on or close to any part of a mold, as that would deface or ruin the mold. It was customary to make a cast or casts in the upper molding space in the morning, and to make a cast or casts in the lower molding space in the afternoon. Plaintiff was hurt in the forenoon.

In going to the water cooler, plaintiff saw the molder, Mr. Varner, in the molder's pit, and spoke to him. The presence of the molder at that time and place indicated that a cast was to be made. At that time a mold several feet wide and several feet long had been made in the upper molding space, and molten iron was coming from the furnace while plaintiff was at the water cooler. It was customary for the molder to put up a rail or bar about four feet from the ground around a mold when iron was in it. He had no instructions to do so, and sometimes did it and sometimes did not. He did not do so on the occasion in question. While plaintiff was at or near the water cooler, the whistle of the engine was sounded. That was a signal that the engine was ready to leave, and for plaintiff to hurry back to it. When the whistle blew, plaintiff started back to the engine on a run. After he started back, and just about the time he started to make a jump across the runway, steam from the furnace enveloped him, with the result that he could not then see where he was going. According to his own testimony, when he jumped, he intended his feet to land over the runway and in the molder's pit. After he jumped, he made another step and his left foot went into the hot iron in the mold in the upper molding space, resulting in the injury complained of.

The steam which enveloped plaintiff resulted from shooting what was called the mud gun, which is a device for stopping the opening through which molten iron comes from the furnace by shooting mud into it. When that is done, steam shoots back from the opening be-

285 F.—22

ing closed. The mud gun was operated by employees who were subject to the superintendence and orders of J. A. Gates. Mr. Gates could have stopped or delayed the shooting by giving a signal. There was no evidence tending to prove that Gates had time to give a signal not to shoot the mud gun between the time he became aware that plaintiff was going back to the engine by a route made dangerous by the presence or proximity of a mold containing hot iron and the time when the mud gun was shot, or that before the mud gun was shot Gates was aware that plaintiff was in ignorance of the existence of the mold in the upper molding space or of the presence of hot iron in it.

The pleadings raised the issue of contributory negligence on the part of the plaintiff. An exception was reserved to the refusal of the court to give a requested charge to the jury that, if they believed the evidence, they must find for the defendant.

We are of opinion that uncontroverted evidence required the conclusion that plaintiff was guilty of negligence which proximately contributed to the injury complained of. On the subject of the use by employees of the molding pit in going from one side of it to another, there was no phase of the evidence which would support a finding that there was a license or permission to use one of the molding spaces for such a purpose, unless in so doing stepping in a mold, or so near it as to break or deface it, was avoided. The phase of the evidence on that subject which was most favorable to the plaintiff showed that whatever license to use a molding space in crossing could be implied was subject to the condition that notice be taken of the existence and location of a mold, and that injury to it be avoided—that a person crossing keep away from a mold.

There was no evidence that it was customary or permissible to adopt a route which would involve stepping into or defacing a mold, either before or after it contained iron to be cast. If the route followed by the plaintiff in going from the engine was even approximately the same as that by which he started back, he must in going to the water cooler have gone near enough to the mold into which he stepped for its presence to be obvious to one making a reasonable use of his sense of sight. If he remained unaware of its existence, this was due to a negligent failure to look, so as to avoid injury to himself or a mold, at a time and place when and where a mold might reasonably be expected to be. The circumstances under which he acted were such as to make it negligent for any reasonable person situated as he was to run back to the engine by the route he adopted. He was chargeable with knowledge of the existence of the mold, and he knew that about that time molten iron might be expected to be let into that mold, and that metal which could be so used was coming from the furnace until the mud gun was shot. Before his view was obstructed by the steam, he made a jump which reasonably might be expected to result in his stepping into the mold or so near it as to involve injury to it or its contents. He was negligent in adopting a forbidden route for his return to the engine, and in doing so under circumstances which gave warning of the danger it involved.

As above indicated, there was an absence of evidence to support a finding that, after the peril to the plaintiff was disclosed to Gates, there was any negligence chargeable against the defendant which had the effect of keeping the negligence of the plaintiff from defeating his right to recover. The conclusion is that the court erred in refusing to give the above-mentioned requested charge.

Because of that error, the judgment is reversed.

⊄⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes